Haynes, J.
(orally).
This is a petition in error prosecuted in this court for the purpose of reversing the judgment of the court of common pleas in an action wherein the defendant in error was plaintiff, and the plaintiff in error was defendant. The record shows that a suit was brought by the defendant in error before a justice of the peace to recover possession of a dog, to-wit: one Gordon setter dog, black ‘and tan. It was prosecuted to judgment in that court, and an appeal taken to the court of common pleas,.where the case was tried before a jury.
The evidence in brief discloses that Pierce J. Archer was the owner the dog in question, and had him at the place where he resided; and he claims that he kept him tied up most of the time, allowing him to be at large in the morning and evening, perhaps, when there was some person with him. Testimony is also introduced on the part of the defendant to show that the dog was not kept in very close ward, but was allowed to run at large a great deal of the time, so that there was a matter of dispute in regard to that. The testimony further discloses that on a certain day, Saturday, the 5th of October, Flannigan, who says himself that he was pound keeper, and had been for the period of eleven years before, in the city of Toledo, was passing near the corner of Madison and Superior streets, when some person called to him, and he went over, and the person told him that the dog was following him, and had been persistently following him for a few hours, and he wished that he (Flannigan) would take care of him, and thereupon Flannigan took him to the pound. The occasion of this man being in possession of the dog is not shown further than this: that he himself testifies that on that morning, about 10 o’clock, the dog came to him. The dog was young and hung around him, and continued to do so for two or three hours, until he got tired of having him follow him. When he met Mr. Flannigan, he gave him charge of the dog, and said .to him it was a very good dog, and if anybody else wouldn’t look after him, he would pay the charges. Flannigan took.him, and *14 the dog was kept in the pound until Tuesday, Flannigan testifies that he said to the pound-keeper, Mr. Hoehn, on Monday morning, that he seemed to be a good dog, and he would give a dollar for him rather than have him shot; and he claims that he paid a dollar to Hoehn, who at the time was pound-keeper. And thereupon Flannigan told him that the dog might remain, and if anybody wanted him bad enough to give $5 for him, he could have him.
It appears from the testimony of Baertschi that he was in the habit of coming to town in connection with his market business; and on that Tuesday morning, at 6 or 7 o'clock, he was at the pound also. He said he had lost a dog himself, and went there to see if he could find him. He saw this dog, and Hœhn told him that he could have him, or rather he told Hœhn he would take him, and that he should bring him out to his house After Flannigan came and talked with Hœhn, according to Hœhn's testimony, he took the dog and went out and delivered him to Mr. Baertsehi, he (Hœhn) receiving $5, which was turned over to Flannigan. Baertsehi went hunting with the dog, and on his return plaintiff in error saw the dog attached to Baertschi’s wagon, and promptly cut him loose, and took him home. Thereupon Baertsehi brought suit.
The real controversy is over the ordinance of the city; the right of the city authorities over this dog, and the right to sell him, and in consequence, Baertschi’s title under these proceedings. The ordinances of the city with regard to dogs are as follows:
“ Sec. 250. It shall be unlawful for any person owning or harboring any animal of the dog kind to suffer or permit such animal to run at large in any of the streets, alleys, public landings, parks, market spaces or commons of the city, without first having obtained a license therefor from the mayor, and complied with the provisions hereinafter stated.”
Sec. 251 provides for the issuing of a license and the at-attaching to the dog of a tag, and its number, etc.
*15 Section 253 provides :
“It shall be unlawful for any person owning or harboring any animal of the dog kind to suffer or permit such animal to run at large without a substantial collar of leather, iron, copper, brass or other durable material, to which shall also be attached the license check hereabove referred to ; and it shall be unlawful for any such person to suffer or permit such animal to wear any other license check than the identical one issued by the mayor. In case of loss a duplicate .will be issued by the mayor at the expense of the applicant.”
Sec. 254, which is perhaps not applicable to this case, but which is an important section however, provides this :
“ Whenever in the opinion of the mayor it shall become necessary, in order to prevent the disease of hydrophobia, to restrain all dogs from running at large within the city of Toledo, he shall issue a proclamation declaring it unlawful for any dogs to run at large unless the same are muzzled for the time to be specified in such proclamation, and during said time so specified, any dogs found, running at large unmuzzled shall be killed.”
There is no evidence to show that any proclamation of.this kind at any time had been issued. This case does not come under that section. Sec. 256 provides that:
“ The pound-keeper shall receive into the pound any and all dogs found running at large contrary to the provisions of this chapter, and any person delivering to said keeper any dog or dogs not wearing the proper license check, shall receive from said keeper, signed by him in ink, a certificate in the following form.”
And gives the form. And then it provides for the manner in which the person shall get his 25 cents for bringing the dog in, and then proceeds:
“ Said keeper shall safely restrain each dog so delivered to him in said pound for the period of not less than twenty-four hours, nor more than sixty hours; and no person shall release such dog therefrom without the authority of said keeper. If any dog so impounded be not reclaimed by the person claiming to be the owner of said dog within the time above speci *16 fied, said keeper shall cause such dog to be shot or drowned, and the carcass buried or otherwise properly disposed of, or such dog may, in the discretion of the keeper, be sold to the highest bidder. The proceeds of such sale shall be paid forthwith to the mayor.”
Then it provides for the manner in which the person who owns the dog can make application for him and get him out of the pound. Sec. 268 provides:
“ Any person or persons offending against any of the provisions of this chapter, shall, for each violation, upon conviction before the police court, be fined in any sum not exceeding $25, nor less than $3, together with costs of prosecution', or be imprisoned not more than twenty days, or both, at the discretion of the court.”
At the conclusion of the evidence, the defendant duly requested the court to charge as follows :
“We instruct you that before a valid sale under this ordinance can be made by the officers, of a dog, in a pound, as this dog is alleged to have been, such dog must be put up at auction and sold at public sale to the highest bidder.
“ 2. The acting pound-keeper, Hoehn, had no light or authority to sell the dog in question to the pound driver, Flannigan, at all.
“ 3. If the jury find that Hoehn was told by Baertschi, before Flannigan bought the dog of him, that he, Baertschi, would give $5 for this dog, and that Hoehn after that sold this dog to Flannigan for $1, in order to allow Flannigan to make $4 for himself, or for himself and Hoehn, such sale to Flannigan is contrary to public policy and good morals, and null and void, and conferred no title upon Flannigan.
“ 4. If the defendant kept his dog tied up upon his premises, and the dog escaped from him without any fau.lt upon his part, and was sent to the pound by Flannigan in the manner described by him, the dog was not running at large within the meaning of the city ordinance.
“ 5. The jury are instructed that the portion of the ordinance of the city of Toledo cited by plaintiff, relating to the *17 impounding of dogs, which authorize their sale, is void and unconstitutional: First, because there is no statute authorizing it, and no power in said city to authorize the seizing and sale of dogs; and second, because it does not provide for notice of any kind before such sale is made.”
Among other things, the court charged this :
“ It was also argued (I don’t know that it was clearly stated, but I think it was intended to be) that the sale was not in conformity with the ordinance, because it was not at public sale, and that there was no bidding, within the meaning of the ordinance. And, gentlemen, on this latter proposition, we are compelled to hold with counsel for the defense. We think that the ordinance, in providing that the sale may be made to the highest bidder, recognizes and necessarily involves the putting up of the thing to be sold at auction in some form; and we say to you that if you find from the evidence that this property was put up at auction and sold, so that the public were invited to bid, and whoever was near was invited to bid, it was a following of the ordinance; but if you find from the evidence that this was not done — if you find from the evidence that what was done was simply saying by Mr. Flannigan, "Don’t shoot that dog; I will pay the dollar,” and that was all there was of it, we say to you that that was not a following of this ordinance in the sale of the dog to Mr. Flannigan.”
The evidence shows very clearly that that is just about what Flannigan did say to Mr. Hoehn at the time. He said the dog was too nice to be shot, and ought not be killed, and in order not to have the dog shot he would give a dollar for it. This was said about the time Hoehn shouldered his gun to go out and shoot the dog, as it is claimed, and yet, although that was given, a verdict was found for the plaintiff, and the verdict was not set aside.
The court with some doubts, as he states, held that the ordinance with regard to the sale was a valid ordinance; and that is the real point in controversy here. And the main ques *18 tion that has been argued, and the main question that we have been called upon to decide is, whether the sale of this dog by the authorities was a valid sale — whether the ordinance giving them authority to make the sale was a valid ordinance.
No controversy is made here, but that a dog is an animal that is of value, and that is recognized as property. While the Supreme Court at one time held that it was not the subject of larceny, yet they recognize under the decisions from the common law, and from Blackstone down, that it was property sufficient to maintain a civil action, and could be protected as property. We take it for granted that a dog is subject to ownership as property, and would be protected by the courts. A decision of the Supreme Court is cited here, Rosenbaugh v. Saffin, 10 Ohio, 31, which, it seems to us, should have been decisive of this case. In that case some hogs had been impounded by the marshal of the city of Cincinnati, and sold perhaps, and trial was had in relation to the matter. The ordinance under which it was sought to justify the marshal, provided:
“ It shall be unlawful for hogs, of any size'or description, to be let loose and run at large in the streets, lanes, alleys or commons within the city ; * * * it shall be the duty of the marshal to cause all hogs, of whatever size or description, that shall be found running at large in the streets, lanes, alleys, or commons of the city, to be taken up, impounded, and sold to the highest bidder, within three days after being impounded, having first caused the time and place of such sale to be proclaimed through the streets and by handbills, and to pay into the city treasury the proceeds of all such sales, after paying the necessary expenses.”
Three sections of the charter are relied on, as giving the power to make this ordinance :
“ Sec. 8. The city council shall have power * * * to impose fines, forfeitures, and penalties on all persons offending agaist the laws and ordinances of said city, and provide for the prosecution, recovery, and collection thereof.
“ Sec. 12. The city council shall have power, and they are hereby authorized, to require and compel the abate *19 ment and removal of all nuisances within the limits of said city, under such regulations as shall be prescribed by ordinance.
‘‘ Sec. 13. The city council shall have power, whenever the public convenience or safety shall require it, to prohibit hogs, cattle, horses, and any other description of animals, from running at large in the streets, lanes, alleys, commons, and other public places in said city.”
The court, after discussing the question at some length, closes by saying:
“ The city corporations which have grown up in modern times are of infinite advantage to society; they bind men more closely together than does any other form of political association. But that which most remarkably distinguishes them from the close corporations which formerly existed, is the general spirit of freedom which has not been breathed into them. More especially is this the case with town corporations in America, which are as different from those of England as the latter are from the similar corporations in Scotland and Holland. Occasionally, however, we see symptoms of the old forms showing themselves; the maxim, that the safety and well-being of the people are the supreme law, sometimes persuades those who are invested with authority that they may be permitted to pursue so noble an end, by any means short of tyrannical. It is a great improvement in legislation to pursue the good of the majority; the true end at which American institutions aim, is to consult the rights and interests of all conditions of men. There was no necessity for the summary process which was directed by the ordinance of the city of Cincinnati of June 15, 1836. The mischief, and it is undoubtedly one, which was intended to be guarded against, might be prevented as effectually by a different proceeding. Unless there be a special custom, or express legislative authority for it, the penalty of a by-law cannot be enforced in this way. There can be no custom in this instance, and the legislative authority which is contained in the charter, does not necessarily or naturally import the exercise of the *20 power. The ordinance commands and empowers the marshal to seize and impound the property, and then, without any reserve, without any notice to the party, by means of which he might be enablod to exculpate himself, directs it to be sold, and the proceeds to be placed in the city treasury. Such an ordinance is as contrary to the spirit of the charter as it is alien from the general genius of our institutions.”
And a new trial was granted.
A recent case has been decided in the state of New York, which maybe found in 119 N. Y. It is the case of Lawton v. Steele, and commences at page 226. It seems to have been a case that was very thoroughly argued, and the decision is very full, and a very learned discussion of the whole question. That was a case wherein the legislature of the state of New York had enacted that—
“ Any net found, or other means or device for taking or capturing fish, or whereby they may be taken or captured, set, put, floated, had, found or maintained in or-upon any of the waters of this state, or upon the shores or islands'in any waters of this state, in violation of any existing^or hereafter enacted statutes or laws for the protection of fish, is hereby declared to be and is a public nuisance, and may be abated and summarily destroyed by any person, and it shall be the duty of each and every (game and fish) protector aforesaid, and of every game constable, to seize and remove and destroy the same, * * * and no action for damages shall be maintained against any person for or on account of any seizure or destruction.”
The syllabus recites that—
“The state legislature has power to declare places or property used to the detriment of public interests or the injury of the health, morals or welfare of the community, public nuisances, although not such at common law. It seems, however, this power may not be used as a cover for withdrawing property from the protection of the law, or, arbitrarily, where no public right or interest is involved, in declaring property a nuisance for the purpose of devoting it to destruction, and if *21 the court- oau judicially see that the statute is a mere evasion or was framed for the purpose of individual oppression, it may be set aside as unconstitutional.
“ The legislature has power to regulate and control the right of fishing in the public waters of the state, and in the exercise of this power may prohibit the taking offish with nets in specified waters, and by its declaration, make the setting of nets for that purpose a public nuisance.
“ Where a public nuisance consists in the location or use of tangible personal property, so as to interfere with or obstruct a public right or regulation, the legislature may authorize its summary abatement by executive agencies, without resorting to judicial proceedings; and any injury to or destruction of the property necessarily incident to the exercise of the summary jurisdiction, interferes with no legal right of the owner, and is not violative of the constitutional prohibition against depriving the owner of his property without due process of law.
“The legislature, however, may not decree the destruction or forfeiture of property used so as to constitute a nuisance, and appoint officers to execute its mandate as a punishment of the wrong or even to prevent a future illegal use of the property, it Dot being a nuisance per se.”
The first question discussed is as to the right of the legislature to declare the setting of nets in the waters of the Black river, that being the point at which the nets were set, a nuisance; and after maintaining that that may be done, and that they have the right to declare them a'nuisance, it proceeds then to treat the question as to how they may be abated. And it is held that where these nuisances are found actually existing, present nuisances within the description of the statute, that they may be destroyed. And in the closing, or toward the latter part of the decision (page 239) they say:
“ But-where a public nuisance consists in the location or use of tangible personal property, so as to interfere with-or obstruct a public right or regulation, as in the case of the *22 float in the Albany basin, or the nets in the present ease, the legislature may, we think, authorize its summary abatement by executive agencies without resort to judicial proceedings, and any injury or destruction of the property necessarily incident to the exercise of the summary jurisdiction, interferes with no legal right of the owner. But the legislature cannot go further. It cannot decree the destruction or forfeiture of property used so as to constitute a nuisance as a punishment of the wrong, nor even, we think, to prevent a future illegal use of the pioperty, it not being a nuisance per se, and appoint officers to execute its mandate. The plain reason is that due process of law requires a hearing and trial before punishment, or before forfeiture of property can be adjudged for the owners’s misconduct. Such legislation would be a plain usurpation by the legislature of judicial powers, and under guise of exercising the power of summary abatement of nuisances, the legislature cannot take into its own hands the enforcement of the criminal or quasi criminal law.
“The inquiry in the present ease comes to this : Whether the destruction of the nets set in violation of the law, authorized and required by the act of 1883, is simply a proper, reasonable and necessary regulation for the abatement of the nuisance, or transcends that purpose, and is to be regarded as the imposition and infliction of a forfeiture of the owners’ right of property in the nets in the nature of a punishment. We regard the case as very near the border line, but we think the legislation may be fairly sustained on the ground that the destruction of nets so placed is a reasonable incident of the power to abate the nuisance. The Owner of the nets is deprived of his property, but not as the direct object of the law, but as an incident to the abatement of the nuisance.”
There is a ease found in 4 C. C. Rep. which has somo bearing upon this question. (Brill v. The Ohio Humane Society, 4 C. C. Rep. 358.) The syllabus is as follows :
“1. Section 3725a, Revised Statutes, which provides that: “ Any sheriff, constable, marshal, policeman or agent of any *23 society for the prevention of cruelty to animals, may kill, or' cause to be killed, any animal found neglected or abadoned, and which in the opinion of three reputable citizens, is injured or diseased past recovery, or by age has become useless,” contravenes section 19„ Art. 1 of the Constitution/ which protects the property of every individual, subject only to the public welfare, and provides for compensation when taken, no condition of the animal being described in said section such as would make her dangerous to the public health or safety.
“2. But even if it were within the authority of the legislature to empower a person to kill ananimal which came under the terms of sec. 3725a, yet it cannot impart to a determination of this sort a conclusive character, as against the owner, and legislation intending such result is fatal. The owner, for such acts, is entitled to be heard in a proper tribunal, and his rights of property determined.”
It is proper to say that there are authorities — and some are cited — notably a case in 12 F. R., citing a case from the Supreme Court of Kansas, wherein that court held that the right to destroy a dog under a statute like this was clear and unequivocal.
The ordinance, it will be noted, really provides for the killing or selling of unlicensed dogs found running at large without the license check provided for by the ordinance; and we are clearly of the opinion that insofar as the ordinance provides for the sale of the dog it is unconstitutional.
Upon the dog being sold by the pound-master, under the ordinance, the purchaser must, by the terms of the ordinance, before he is permitted to take him, obtain a license for the dog, and have the license check attached to a collar about the neck of the dog, and then the dog may be permitted to run at large at will. Certainly the license check does not change the character of the dog. He is as much a nuisance with the check attached as without the *24 check. The check, if he be dangerous, takes nothing from his dangerous character, nor does its absence in any manner add anything thereto.
Parks & Barber and A. H. Swayne, for plaintiff in error.
Frank Wright, for defendant in error.
The provision of the ordinance for the sale of the dog is clearly in the nature of a penalty or punishment imposed upon the owner for not taking out the license required, and permitting the dog to run at large without the license check, and the penalty is imposed without any notice to the owner, or any hearing before any judicial tribunal, or the judgment of such tribunal.
Within the rules of law laid down in the cases cited, the provision in regard to the sale of dogs impounded is uncontitutional.
We also think with the court below, that the sale of the dog to Flannigan was clearly an illegal sale, and we think also for the reason we have stated, that the sale made to Baertschi was an illegal sale and that he acquired no title whatever to the property. For that reason the judgment of the court of common pleas should be reversed.
With regard to section 254, it is sufficient to say that we do not pass upon it in this case, nor do we pass upon the question as to whether or not the pound-keeper has a right to kill a dog that is taken and put in the pound under circumstances similar to those in this case. The question does not arise here, because the dog was not killed ; and we prefer to let that question stand until it is brought before us in a proper form.
The judgment of the court of common pleas in this case will be set aside, and the case remanded for a new trial.